Randall SMITH, Executor of the Estate of Flora Smith, Deceased, and Randall Smith in his own right, Appellant,

v.

Edmundo GRAB, M.D., and Julia Burke, an individual.

Randall SMITH, Executor of the Estate of Flora Smith, Deceased, and Randall Smith in his own right,

v.

Edmundo GRAB, M.D., and Julia Burke, an individual.

Superior Court of Pennsylvania.

Argued June 10, 1997.
Filed Nov. 24, 1997.

Maureen Dunn Harvey, Pittsburgh, for Smith.

Robert Weinheimer, Pittsburgh, for Burke.

M. David Halpern, Altoona, for Grab.

Before CIRILLO, President Judge Emeritus, and JOHNSON and FORD ELLIOTT, JJ.

CIRILLO, President Judge Emeritus:

■ Randall Smith, in his own right and as Executor of the Estate of Flora Smith, appeals from an order entered in the Court of Common Pleas of Blair County denying a motion to remove a compulsory nonsuit and a motion for new trial.[1] Julia Burke, a physician's assistant, has taken a cross-appeal from an order denying her cross-motion for post-trial relief.[2] We reverse the order refusing to remove the compulsory nonsuit and remand for trial. Additionally, we quash the cross-appeal.

Randall Smith and Flora Smith, husband and wife, commenced this action for medical negligence, misrepresentation, and punitive damages against Edmundo Grab, M.D., and

---

1. Where a court has entered a judgment of compulsory nonsuit, the appeal lies not from the entry of the judgment itself, but rather from the court's refusal to remove it. *Biddle v. Johnsonbaugh*, 444 Pa.Super. 450, 664 A.2d 159 (1995).

2. The trial court entered an order dated September 5, 1996, denying Mr. Smith's motion for removal of a compulsory nonsuit/new trial. This order, which was actually filed on September 6, 1996, is the order appealed in Mr. Smith's notice of appeal.

The trial court also entered an order dated September 9, 1996, denying Ms. Burke's cross-motion for post-trial relief. This order, which was actually filed on September 10, 1996, is the order appealed in Ms. Burke's notice of appeal.

his physician's assistant, Julia Burke. The pertinent facts are as follows. Mrs. Smith testified (via videotaped deposition) that on January 23, 1994 she suffered severe pain when her left breast became very enlarged, acquired the texture of an orange peel, and became hard, red and inflamed.[3] Mrs. Smith called Dr. Grab's office and scheduled an appointment. Mrs. Smith had been a patient of Dr. Grab's since 1977. On January 26, 1994, Mrs. Smith went to her scheduled appointment; she was seen first by a nurse and then by Ms. Burke, whom Mrs. Smith assumed was a doctor.[4] Ms. Burke did not introduce herself as a physician's assistant. Ms. Burke determined that Mrs. Smith's symptoms were caused by mastitis, an inflammation of the breast. The antibiotic Ampicillin was prescribed, along with hot compresses three times a day. Mrs. Smith's condition, however, did not improve. Her pain increased. Mrs. Smith scheduled another appointment for February 3, 1994. This time she was seen only by Ms. Burke. Mrs. Smith was prescribed Keflex, a stronger antibiotic. John T. Weibel, M.D., Dr. Grab's partner, signed both of Mrs. Smith's prescriptions for the antibiotics.

After taking the Keflex, Mrs. Smith's pain continued. Additionally, a brown liquid had begun to leak from her breast. She was told to return to the doctor's office. After missing an appointment on February 9th due to inclement weather, Mrs. Smith returned to the office on February 16, 1994. During that visit, Mrs. Smith was again seen by Ms. Burke, who scheduled a mammography for the same day and referred Mrs. Smith to a surgeon. A biopsy was performed, which revealed cancer, specifically, inflammatory carcinoma of the left breast. Mrs. Smith sought a second opinion at Roswell Park Cancer Institute on February 24, 1994, and began receiving chemotherapy on March 7, 1994. Mrs. Smith did not respond to the treatment, and she died on September 24, 1995.

The Smiths' complaint alleged that Ms. Burke was negligent in her failure to diagnose inflammatory breast carcinoma and in her failure to refer Mrs. Smith to a physician. It was alleged that Dr. Grab acted with reckless disregard when he entrusted Mrs. Smith to a physician's assistant on three occasions which resulted in the three-week delay in the diagnosis and, consequently, increased her risk of death.

At the pre-trial conference, Mr. Smith identified his expert as Dr. Barry Singer and submitted a report containing Dr. Singer's medical opinions and conclusions. Dr. Singer concluded that there was a significant delay in the diagnosis of Mrs. Smith's condition and that this three-week delay decreased the patient's prognosis for survival. Dr. Grab and Ms. Burke filed a motion to compel, seeking authority upon which Dr. Singer based his opinions. This led to an exchange of interrogatories wherein Dr. Singer identified sources for his opinions.[5] Dr. Grab and Ms. Burke then filed a motion *in limine*, a motion for summary judgment, and a motion to strike Dr. Singer's testimony. The defendants asserted that Dr. Singer had no basis for his opinion and that his conclusions were not generally accepted in the medical community. The trial judge denied all motions.

Trial commenced and Dr. Singer took the stand. After direct examination on his qualifications, defense counsel proceeded to cross-examine Dr. Singer. Responding to counsel's questions, Dr. Singer testified that he had done no research on delay in treatment. He also stated that there are existing texts which state that a delay in the diagnosis of any cancer can have a material effect on the patient. During this questioning, the court excused the jury and held an *in camera* hearing to explore the foundation for Dr. Singer's opinions. Upon inquiry, Dr. Singer

---

3. Mrs. Smith had a family history of breast cancer; her sister had undergone a radical mastectomy at the age of 40.

4. Ms. Burke was wearing a white coat and carrying a stethoscope. Mrs. Smith could not remember whether or not she was wearing a name tag.

5. Specifically, Dr. Singer identified the following texts in his interrogatories: *Breast Diseases,* edited by Jay R. Harris, *et al.* Second Edition, 1991; *Harrison's Principles of Internal Medicine,* 12th Edition, 1991; and *High Risk Breast Cancer,* edited by Joseph Ragaz and Irving M. Ariel, 1991 edition.

admitted that none of the texts he cited as supportive in previous answers to interrogatories contained the specific opinion that a three-week delay in the diagnosis of a patient with inflammatory carcinoma has any effect on a patient's prognosis. Dr. Singer proceeded to testify that the basis of his opinion was his general knowledge, education, reading, and experience during twenty-five years as a practicing oncologist. On this basis, he opined that inflammatory breast cancer is a rapidly growing cancer, and the cancer could progress from one stage to another within weeks or months if not treated. Thus, Dr. Singer claimed, delay in Mrs. Smith's diagnosis was significant.

Following a brief recess, the trial court granted the defendants' motion to strike off the proffered testimony of Dr. Singer. The court stated that it "has no problem with the qualifications of the witness," rather, "the ruling goes to the articles that he cited and the basis for the opinion. Just being an expert does not grant him the status to have an opinion out of thin air or based on other matters that were not the subject matter of his responses to written interrogatories." The court then granted a compulsory nonsuit, "there being a requirement of expert testimony that is necessary for such causation, and this Court's prior ruling as to the lack of authoritative basis precludes the plaintiff from going forward on that basis."

Mr. Smith filed a motion for post-trial relief in the nature of a motion for removal of nonsuit and motion for new trial. Post-trial relief was denied, and this appeal followed. Mr. Smith raises the following issues for our consideration:

(1) Whether the trial court applied the wrong legal standard in striking off the proffered testimony of plaintiff's medical expert and entering a compulsory nonsuit, where the expert's opinion that delay caused by defendant's misdiagnosis increased the risk of decedent's premature death, was based upon his education, training, experience and treatment of patients with conditions similar to those of decedent?

(2) Whether the trial court's "finding of fact that as a matter of law Defendants' conduct does not rise to the level of outrageousness which would support a punitive damage award," a disposition on the merits, was error?

(3) Whether the trial court abused its discretion in a series of evidentiary rulings in:

(a) precluding the testimony of two lay witnesses who were listed as witnesses in response to interrogatories and as damage witnesses in plaintiff's supplemental pre-trial statement, on the ground that they were not specifically listed in response to two interrogatories seeking identity of witnesses with knowledge of decedent's treatment?

(b) striking plaintiff's supplemental affidavit/report as untimely when it was timely filed in opposition to issues raised in defendants' motions in limine and motions for summary judgment?

Additionally, appellee/appellant Julia Burke raises one issue in her cross-appeal:

(1) Whether the plaintiff may state a cause of action for negligence or fraud based upon alleged violations of the Physician's Assistant Statute and/or Pennsylvania Code provisions promulgated thereto where there is no indication in the statute or code that a private cause of action was intended, the statute was not raised by the pleadings and the plaintiff's expert failed to identify how the alleged violations were causally related to plaintiff's claim?

Our standard of review in determining the propriety of an entry of nonsuit is well settled:

[I]t is proper only if the factfinder, viewing all the evidence in favor of the plaintiff, could not reasonably conclude that the essential elements of a cause of action have been established. *Biddle v. Johnsonbaugh*, 444 Pa.Super. 450, 664 A.2d 159 (1995); *Orner v. Mallick*, 432 Pa.Super. 580, 584, 639 A.2d 491, 492 (1994). "When a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement." *Gregorio v. Zeluck*, 451 Pa.Super. 154, 158, 678 A.2d 810, 813 (1996) (citing *Dion v. Graduate Hospital of Univ. of Pennsylvania*, 360 Pa.Super. 416,

520 A.2d 876 (1987)). A compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established and the plaintiff must be given the benefit of all favorable evidence along with all reasonable inferences of fact arising from that evidence, resolving any conflict in favor of the plaintiff. *Coatesville Contractors v. Borough of Ridley,* 509 Pa. 553, 506 A.2d 862 (1986); *Poleri v. Salkind,* 453 Pa.Super. 159, 683 A.2d 649 (1996). The fact-finder, however, cannot be permitted to reach a decision on the basis of speculation or conjecture. *Biddle,* 444 Pa.Super. at 455, 664 A.2d at 161.

*Joyce v. Boulevard Physical Therapy & Rehab. Ctr.,* 694 A.2d 648, 652–53 (Pa.Super.1997).

■ In proving a medical malpractice case,[6] a plaintiff is required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered. *Flanagan v. Labe,* 446 Pa.Super. 107, 111, 666 A.2d 333, 335 (1995), *aff'd,* 547 Pa. 254, 690 A.2d 183 (1997).

■ We find the reasoning first espoused in *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978) to be controlling in the instant case. In *Hamil,* the defendants did not promptly diagnose and treat a patient's heart attack, leading to the patient's death. Whether there was a causal connection between the defendants' delay and the patient's death was not susceptible of proof to a reasonable degree of medical certainty; however, it could be shown to a reasonable degree of medical certainty that the defendants' negligence increased the risk of death. The supreme court adopted a reduced standard of certainty in such cases:

> Such cases by their very nature elude the degree of certainty one would prefer and upon which the law normally insists before a person may be held liable. Neverthe-

less, in order that an actor is not completely insulated because of uncertainties as to the consequences of his negligent conduct, Section 323(a) [of the Restatement (Second) of Torts] tacitly acknowledges this difficulty and permits the issue to go to the jury upon a less than normal threshold of proof.

*Id.* at 271, 392 A.2d at 1287–88 (footnote omitted). Thus, "once a plaintiff has demonstrated that [a] defendant's acts or omissions . . . have increased the risk of harm to another, such evidence furnishes a basis for the fact-finder to go further and find that such increased risk of harm was in turn a substantial factor in bringing about the resultant harm[.]" *Id.* at 272, 392 A.2d at 1288 (footnote omitted).

In *Jones v. Montefiore Hosp.,* 494 Pa. 410, 431 A.2d 920 (1981), the plaintiff had been referred to the defendant hospital for treatment of an unidentified mass in her right breast. Doctors removed two masses, but did not entirely remove a portion of one of the masses. The remaining mass continued to grow. The doctors, while aware of the problem, did not recommend or administer further treatment. It was later discovered that the mass was cancerous, had spread to a lymph node, and that chemotherapy and a modified radical mastectomy would be necessary. The jury returned a verdict for the defendants. Our supreme court reversed, reiterating the *Hamil* rationale. The court stated that a "medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, and the jury then must decide whether that conduct was a substantial factor in bringing about the harm." *Id.* at 416, 431 A.2d at 923. The supreme court reasoned that because the testimony had shown that the defendants' conduct increased the patient's risk of injury from a known mass, the jury should have been instructed that it could find liability if it decided that the defendants' negligence had been a substantial factor in

---

**6.** In order to prove a *prima facie* malpractice case, a plaintiff must establish: (1) a duty owed by the physician to the patient; (2) a breach of that duty; (3) that the breach of duty was the proximate cause, or substantial factor in bringing

about the harm suffered by the patient; and (4) damages suffered by the patient that were a direct result of the harm. *Mitzelfelt v. Kamrin,* 526 Pa. 54, 62, 584 A.2d 888, 891 (1990).

bringing about the harm. *Id.* at 416, 431 A.2d at 924. *See Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888 (1990) (citing to *Hamil* and *Jones,* the court espoused that once there is testimony presented that a defendant neglected "to detect the cancer in a timely fashion, and such failure increased the risk that the woman would have . . . a shortened life expectancy . . . then it is a question for the jury whether they believe . . . that the acts or omissions of the physician were a substantial factor in bringing about the harm."); *cf. Montgomery v. South Philadelphia Medical Group,* 441 Pa.Super. 146, 656 A.2d 1385 (1995) (where plaintiff, who had been complaining of breast pain, had been seen by a physician's assistant, had a mammography performed, and continued to complain of pain in her breast, was eventually seen by a doctor and was diagnosed with cancer, the expert doctor's testimony was insufficient to submit to a jury where the expert was unable to state that the risk of harm had been increased by the failure to refer the plaintiff to a physician; this court upheld the trial court's entry of nonsuit).

In determining whether the trial court properly entered a nonsuit, we note that the court's role in the instant case was merely to establish whether there was testimony presented that the failure to detect Mrs. Smith's cancer in a timely fashion increased the risk that she suffered harm, i.e., a shortened life expectancy. *Mitzelfelt, supra.* We must decide whether Mr. Smith (through Dr. Singer) introduced evidence that the acts/omissions of Dr. Grab and Ms. Burke did indeed increase the risk of harm to Mrs. Smith. *Mitzelfelt, supra; Hamil, supra; Jones, supra.*

▮ Dr. Singer, a practicing oncologist for twenty-five years, testified that the three-week delay in Mrs. Smith's diagnosis was "significant" in her prognosis. Specifically, he opined that, in his experience in treating inflammatory breast cancer patients, "inflammatory breast cancer is a rapidly growing cancer," capable of moving "from one stage to another within weeks or months, if not treated." When asked if it were his opinion that a "significant delay in the diagnosis in treatment of inflammatory breast cancer may have potentially catastrophic consequences

for . . . patients," Dr. Singer replied, "certainly, because it grows so rapidly." We are convinced that Dr. Singer's testimony distinctly conveyed to the trial court that the three-week delay in diagnosing Mrs. Smith increased her risk of harm/shortened life expectancy. The expert did not use the words "increased risk of harm" in his testimony. This court, however, does not require that experts use "the magic words" when testifying; rather we look to the substance of the testimony. *Mitzelfelt,* 526 Pa. at 67, 584 A.2d at 894. Dr. Singer clearly opined that the type of cancer for which Mrs. Smith was treated was rapidly growing, was able to go from one stage to another in a matter of weeks, and that delay in diagnosis could have fateful consequences for a patient. Given our conclusion that Dr. Singer set forth evidence of "increased risk of harm," it becomes the function of "the jury, not the medical expert, to balance probabilities and decide whether [the appellees'] negligence was a substantial factor in bringing about the harm." *Hamil,* 481 Pa. at 273, 392 A.2d at 1288–89.

▮ It follows that the trial court erred in striking Dr. Singer's testimony and entering nonsuit in favor of Dr. Grab and Ms. Burke. Dr. Singer's proffered testimony should have been heard by the jury. *Mitzelfelt, supra; Jones, supra; Hamil, supra.* In striking the expert's testimony, the trial court cited a lack of authoritative basis for Dr. Singer's opinion, which led to the court's decision to enter a nonsuit. The fact that none of the texts cited by Dr. Singer contained an opinion regarding the specific three-week delay at issue is not grounds for striking the expert's testimony. *See Taliferro v. Johns–Manville Corp.,* 421 Pa.Super. 204, 216, 617 A.2d 796, 803 (1992) (fact that plaintiff's factual situation is not identical to the situation relied upon by his expert witness "is a matter of **weight** to be assigned the expert's testimony[.]") (emphasis added). Dr. Singer's failure to cite an article or text on point goes to the weight of his testimony, not its admissibility. The basis for Dr. Singer's testimony was his knowledge, education, reading and experience of 25 years as a practicing oncologist. Based upon such ex-

perience, he was able to offer an opinion that the delay in Mrs. Smith's diagnosis increased her risk of a shortened life expectancy. *See Joyce,* 694 A.2d at 656 (this court determined that it was not necessary to have an expert doctor cite to treatises and medical periodicals to support his articulation of the standard of care; his thirty years in the field of orthopedic medicine was sufficient to support an opinion regarding the relevant standard of care). In entering a nonsuit, the trial court did not give the plaintiff "the benefit of all favorable evidence along with all reasonable inferences of fact arising [therefrom];" the lack of evidence to sustain the action was obviously not "so clear that it admits no room for fair and reasonable disagreement." *Joyce,* 694 A.2d at 652–53. We reverse the trial court's order denying Mr. Smith's motion for removal of a compulsory nonsuit and remand for trial.

■■■■ Mr. Smith next challenges the trial court's determination relating to punitive damages. After entering a compulsory nonsuit in favor of appellees Grab and Burke, the trial court made a "finding of fact that as a matter of law, Defendants' conduct does not rise to the level of outrageousness which would support a punitive damage award."[7] The function of punitive damages is to punish for outrageous conduct done in reckless disregard of another person's rights. *Schecter v. Watkins,* 395 Pa.Super. 363, 383, 577 A.2d 585, 595 (1990). Punitive damages must stem from liability on the cause of action because they are an element of damages flowing therefrom; thus, **if no actual damages are sustained, an award of punitive damages is not appropriate.** *Id.* (emphasis added). *See Houston v. Texaco, Inc.,* 371 Pa.Super. 399, 405, 538 A.2d 502, 505 (1988) (punitive damages cannot be recovered in the absence of a legally recognized injury; they may not be awarded where plaintiff is precluded from recovering compensatory damages).

Here, the entry of a nonsuit by the trial court precluded the recovery of compensatory damages; thus, punitive damages were foreclosed as well. *Schecter, supra; Houston, supra.* The trial court's factual/legal determination regarding the propriety of the punitive damages issue, therefore, was unnecessary. In light of our directive to remand for trial, a punitive damages issue is not ripe for review at this time. *See Geyer v. Steinbronn,* 351 Pa.Super. 536, 560, 506 A.2d 901, 914 (1986) (in referring to a Superior Court case in which an appeal had been taken from an order entering nonsuit and punitive damages were discussed, this court deemed such discussion "arguably dictum.... Obviously, no damage issues were ripe at that point.").

Mr. Smith's third issue on appeal challenges the trial court's decision to preclude two witnesses from testifying at trial. On the first day of trial, Mr. Smith's counsel announced that he would call Elaine Smith to the stand. Counsel for Dr. Grab asked for an offer of proof, whereby Mr. Smith's counsel stated that Elaine Smith, Flora Smith's mother-in-law, saw Flora's breast when Flora was taking the prescribed antibiotics, and that the breast was swollen twice its size, was pink, had an orange peel texture, and had an inverted nipple. The described appearance of the breast was contrary to what Ms. Burke had testified to in her videotaped deposition. Plaintiff's counsel also averred that Elaine Smith would testify as to how Flora spent her time after she was diagnosed with cancer.

Defense counsel responded that the witness should not be permitted to testify to the condition of Flora Smith's breast because the defendants were not put on notice that she would do so. Specifically, defense counsel pointed out that Elaine Smith was not mentioned in the following answers to interrogatories:

2. What are the names and present addresses of any persons who have knowledge of any facts, events, conditions or circumstances concerning the following:

---

7. This language was made part of an order entered by the trial court dated August 20, 1996 (the same order granting compulsory nonsuit). While the August 20th order is not the order from which Mr. Smith takes the instant appeal,

Mr. Smith did challenge the propriety of the trial court's punitive damage decision in his motion for post-trial relief, the denial of which is the subject of his notice of appeal (order dated September 5, 1996, filed September 6, 1996).

(a) The alleged incident giving rise to the treatment by Dr. Edmundo Grab or Julia Burke;

(b) Events, conditions and circumstances leading up to the incident giving rise to the treatment by Dr. Edmundo Grab or Julia Burke;

(c) Events, conditions and circumstances following the incident giving rise to the treatment by Dr. Edmundo Grab or Julia Burke.

3. What are the names and addresses of any persons having knowledge of any facts, events, conditions or circumstances concerning the treatment provided by Dr. Edmundo Grab or Julia Burke.

Mr. Smith's counsel in turn responded that Elaine Smith, Faye Gates and Lorraine Fillman had been listed in response to interrogatory number 13, which sought the "names and addresses of any other witnesses Plaintiff is aware of other than those stated in the Answers to the preceding interrogatories." Faye Gates was another witness who was willing to testify as to the condition of Flora Smith's breast. Additionally, Elaine Smith and Faye Gates were listed in Mr. Smith's "Supplemental Pre-trial Statement," which enumerated "additional individuals" who may be called as witnesses. The trial court sustained defense counsel's objection to the testimony proffered by Elaine Smith and Faye Gates as to their observations of Flora Smith's breast during the period of time that she was taking the antibiotics. The court stated that such observations "go to the core issues of this case, go to the core issues of **treatment, and ... should have been listed in Questions 2 and 3 in the Answers to Interrogatories** and were not.... The Rules of Civil Procedure preclude trial by ambush and this Court is not going to weaken and water down those Rules." [8]

While counsel for Mr. Smith was aware that Elaine Smith and Faye Gates could testify as to Flora Smith's actions after she was diagnosed with cancer, he admits that he did not know until the eve of trial that these women could provide testimony as to the description of Flora Smith's breast while she was being treated by Ms. Burke. Even so,

Mr. Smith's counsel claims that the witnesses' proffered testimony had nothing to do with "treatment" and that the defendants knew about these witnesses early on and could have discovered the information themselves, i.e., via deposition testimony.

The trial court's order connotes that its ruling was primarily predicated upon an alleged discovery violation, namely, that the witnesses in question were not listed in the proper interrogatory answers so as to give the defendants sufficient notice of the testimony at issue. "The purpose of the discovery rules is to prevent surprise and unfairness and to allow a fair trial on the merits." *Linker v. Churnetski Transp., Inc.,* 360 Pa.Super. 366, 368, 520 A.2d 502, 503 (1987). Analogous case law on this subject is found in those decisions that discuss whether to allow the testimony of a witness who has not been included in a pre-trial memorandum. Such cases focus on the factors a court must consider "in determining whether or not a witness should be precluded for failure to comply with discovery rules[.]" *Id.* at 370, 520 A.2d at 504. These factors are:

(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified,

(2) the ability of that party to cure the prejudice,

(3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of cases in the court,

(4) bad faith of [sic] willfulness in failing to comply with the court's order.

*Id.* (citing *Gill v. McGraw Electrical Co.,* 264 Pa.Super. 368, 382, 399 A.2d 1095, 1102 (1979) (*en banc*)). "In the absence of bad faith or willful disobedience of the rules, the most significant considerations are the importance of the witness' testimony and the prejudice, if any, to the party against whom the witness will testify." *Linker,* 360 Pa.Super. at 372, 520 A.2d at 504 (citing *Feingold v. Southeastern Pennsylvania Transp. Auth.,* 339 Pa.Super. 15, 22, 488 A.2d 284, 288 (1985), *aff'd,* 512 Pa. 567, 517 A.2d 1270

---

**8.** This statement by the trial court was reduced to an order entered on August 20, 1996.

(1986)). Further, we note that "[t]o preclude the testimony of a witness is a drastic sanction, and it should be done only where the facts of the case make it necessary." *Feingold*, 339 Pa.Super. at 20, 488 A.2d at 287.

We do not agree that permitting these two witnesses to testify is equivalent to "trial by ambush." There is no evidence of bad faith on Mr. Smith's part. He did not hide these witnesses from the defendants; to the contrary, both women were listed in the answers to interrogatories and in the supplemental pre-trial statement. There has been no suggestion that calling these witnesses would have disrupted the trial. It is evident that the appearance of Mrs. Smith's breast as it looked while she was under the appellees' care is of significant importance. Moreover, the witnesses could only testify as to the "appearance" of the breast; they were not qualified to testify as to the effect of the "treatment" of the breast, as alluded to by the trial court. The defendants were not unfairly prejudiced. They had knowledge of and access to these witnesses prior to trial; they could have uncovered the disputed information themselves. The facts of this case do not make it necessary to preclude the testimony of these two witnesses. *Feingold, supra.* We reverse the trial court's order precluding the testimony of Elaine Smith and Faye Gates.

Mr. Smith next asserts that the trial court abused its discretion in striking Dr. Singer's supplemental affidavit/report. By order dated November 14, 1995, the trial court stated, in part:

> All pre-trial motions, including Motions in Limine, but not limited thereto, must be filed no later than July 12, 1996. All pre-trial discovery must also be concluded, including depositions, prior to July 12, 1996.

On July 12, 1996, Mr. Smith filed an affidavit/supplemental report prepared by Dr. Singer. Mr. Smith claims that this supplemental report was filed in response to Dr. Grab's and Ms. Burke's motions in limine and motions for summary judgment seeking exclusion of Dr. Singer's testimony.[9] Dr. Grab moved to strike Dr. Singer's supplemental report on the grounds that Mr. Smith was required to file expert reports with his pre-trial statement and, thus, was precluded from filing additional reports after the expiration of the discovery deadline. The trial court granted the motion to strike by an order dated July 31, 1996, which read, in part:

> The Plaintiff's expert, Dr. Singer, will be limited to his report dated June 2, 1995, and the logical inferences which flow therefrom. The information contained in Dr. Singer's affidavit dated July 12, 1996, which expends [sic] upon and adds to his June 2, 1995, report will not be allowed in testimony. This relief is based upon the Order of November 14, 1995, which set forth the deadline of prior to July 12, 1996, all pre-trial discovery was to be concluded.

Initially, we do not find that the supplemental report, filed July 12, 1996, can be precluded solely based upon untimeliness. The trial court's November 14, 1995 order is less than clear as to whether a response to a motion in limine/motion for summary judgment (in this case, in the form of an affidavit/supplemental report) was required to be filed **before** or **no later than** July 12, 1996. Nevertheless, violation of a trial court's discovery order should not be the basis for which testimony is limited. *See Linker, supra* (discovery rules are in place to prevent surprise and unfairness and to allow a fair trial on the merits).

The trial court's ruling again compels us to determine the prejudice to each party. *Feingold, supra.* We are satisfied that the factors set forth in *Gill, supra,* weigh in Mr. Smith's favor. The appellees claim that Dr. Singer, in his supplemental report, changes his theory and/or introduces a new theory of negligence. We cannot agree. While Dr. Singer's supplement expands upon the theories introduced in his original report, and includes citations for such explanations, the supplement does not alter his initial opinion or introduce new negligence theories. The appellees could not have suffered prejudice or surprise based upon the supplemental report. We reverse the trial court's order striking Dr. Singer's affidavit/supplemental report.

9. Such motions were filed on June 24, 1996 and July 9, 1996.

In her cross-appeal, Julia Burke challenges the trial court's order denying and dismissing her cross-motion for post-trial relief.[10] "The law is clear that only an aggrieved party can appeal from an order entered by a trial court." *Green by Green v. SEPTA*, 380 Pa.Super. 268, 271, 551 A.2d 578, 579 (1988); *see* Pa.R.A.P. 501. "Generally, a prevailing party is not 'aggrieved,' and, therefore, does not have standing to appeal an order which has been entered in his or her favor." *Green*, 380 Pa.Super. at 271, 551 A.2d at 579. To be considered "aggrieved," a party must have been adversely affected by the decision from which the appeal has been taken. *Id. See In Re Estate of Geniviva*, 450 Pa.Super. 54, 675 A.2d 306 (1996).

Ms. Burke cannot claim to have been "adversely affected" by the order from which she took her appeal (i.e. the order dismissing her claim for post-trial relief), certainly not after the trial court had granted a nonsuit in her favor. On August 20, 1996, the trial court entered an order granting a compulsory nonsuit in favor of the appellees, the last line of which stated, "this case is concluded." Clearly, Dr. Grab and Ms. Burke were the prevailing parties in this negligence/misrepresentation action. Only Mr. Smith, from whom the trial court refused to remove the compulsory nonsuit, can be considered an aggrieved party with standing to appeal. Because Ms. Burke is not an aggrieved party, we quash her cross-appeal. *Green, supra.*

Reversed and remanded. Cross-appeal quashed. Jurisdiction relinquished.

---

10. Ms. Burke's cross-motion for post-trial relief consists of one alleged error: "The trial court committed error in permitting the Plaintiff to raise and offer into evidence alleged violations of the Physician's Assistant Statute where the statute had not been previously pled in the Complaint[,] is otherwise inadmissible under its own internal regulatory scheme, and the Plaintiff offered no factual expert report that indicated that the alleged violations had any causative impact on Plaintiff's alleged injury."